## Mertz *against* Detweiler.

In a suit against a physician for malpractice whereby the plaintiff lost his leg, *Held,*

1. It being shown that other medical men had been called in for a consultation without invitation or notice to the defendant, a medical witness for the plaintiff might be asked by the defendant as to the practice of physicians in regard to consultations.

2. The witness could not be asked as to the measure of the defendant's responsibility for his patient, not being a subject of professional skill.

3. Nor is testimony admissible on the part of the defendant as to his general skill.

4. The nature and properties of the powders employed by the defendant in the case, were proper questions to medical witnesses called by the plaintiff.

5. The declarations of a prochein amy for the plaintiff made before the writ purchased, are not admissible on behalf of the defendant.

ERROR to the Common Pleas of *Northampton* county, in which a verdict and judgment were rendered for the defendants.

This was an action on the case brought by Henry Mertz by his next friend Jacob Mertz against Henry Detweiler and Charles Detweiler for malpractice as physicians, *per quod* the plaintiff lost his leg. The case came up on bills of exception to evidence.

The plaintiff proved that a consultation was held by several physicians at the request of the plaintiff's father, who examined the plaintiff's leg after it had proceeded to mortification under the attendance of the defendants. A witness for the plaintiff (a physician) stated that Dr Detweiler was not invited to attend this consultation. The defendants then asked the following questions: What is the practice of physicians in regard to consultations? Is it considered fair to exclude a physician, who has had the charge of a case formerly, from the consultation? To this the plaintiff objected, but the court admitted it and sealed an exception.

A witness for the plaintiff (a physician) stated that if the physician had ordered the patient to remain quiet and he ran about, the conduct of the patient would not be proper. Whereupon the defendants asked the witness, "If the patient thus behaves, is the physician responsible for what happens to the wound, or for the termination of the case?" To which the plaintiff objected, but the court admitted the question and the plaintiff excepted.

The plaintiff asked the witness, " What are the component parts

[Mertz v. Detweiler.]

of medicines usually called No. 1 and 2 in Dr Detweiler's practice?" To this the defendants objected, and the court overruled the question and sealed an exception.

The plaintiff then asked, " Are or are not in Homœpathic practice the medicine No. 1 and 2 white?" Also, " Are or are not powders No. 1 and 2 cooling powders?" The defendants objected, the court overruled the questions and sealed bills of exception.

The defendants called a physician, and proposed to prove by him, " that he knows Dr Henry Detweiler—that he had practised with him as a surgeon—and his skill and character as a surgeon." The court admitted the testimony after the plaintiff's objection and sealed an exception.

The defendants further offered in evidence the opinion of the witness in regard to Dr H. Detweiler's knowledge of surgery and anatomy, derived from conversations had with Dr Detweiler on surgical and anatomical subjects. The plaintiff objected, the court admitted the evidence and sealed an exception.

The defendants offered to prove that a witness said to Jacob Mertz he should try and settle it with Dr Detweiler; it would cost him a good deal of money if he went to court with it. He said it would not cost him anything; the doctors would help him through. Also by another witness that J. Mertz said he would put it in law and the doctors would work it through. In the conversation the names of Dr Stout and Dr Martin (two of the plaintiff's witnesses) were mentioned. This was in Mertz's house the day after the leg was taken off. The court admitted the evidence after the plaintiff's objection and sealed an exception.

The bills of exception were the subject of the errors assigned.

*W. A. Porter*, for the plaintiff in error, referred to 3 *Burr.* 1918; 9 *Bingh.* 333; 5 *Barn. & Ald.* 840; 1 *Holt's Cas.* 283; 7 *Wend.* 79; 1 *Phil. Ev.* 290; *Greenl. Ev.* 61, 491; 1 *Green* 232; 10 *Serg. & Rawle* 60; 2 *Bos. & P.* 532; 6 *Cow.* 673; *Greenl. Ev.* 201, 204, 210.

*A. E. Browne*, contra, cited 13 *Serg. & Rawle* 132; 5 *Binn.* 488; 2 *Stark. Ev.* 313; 1 *Ibid.* 548; 1 *Stra.* 548; 2 *Ibid.* 1026.

PER CURIAM. — Under the circumstances of the case, evidence of the " practice of physicians in regard to consultations," was properly admitted. It had been testified that the medical gentlemen called in by the plaintiff's father had met in consultation without notice to the defendant who was the attending physician, or desiring his presence; and they were produced as the plaintiff's witnesses. The fact that they had not extended to him the customary courtesy due to the occasion, therefore, was a circumstance, though a slight one, tending to show that their minds were biassed against him.

VIII. — 48　　　　　2 G *

[Mertz v. Detweiler.]

But the measure of a physician's responsibility for his patient is not a subject of professional skill. Whether the patient's imprudence in disregarding directions led to an aggravation of the disease may be otherwise; but it requires no medical skill to determine that a man is not chargeable with the consequences of another's act; and the question allowed to be put belonged not so much to medicine as to morals. Besides being irrelevant, these fishing questions always contain a concealed argument which it would be improper for the witness to endorse. The answer ought not to have been received.

Of the same stamp was the testimony of the defendant's general skill, which was clearly irrelevant. It was not that, but his treatment of the particular case, with which the jury had to do. If the latter was notoriously bad, of what account would be his abstract science, or treatment of other cases? It may be said that his general qualifications might serve to shed light on the propriety of his practice in this particular instance; but it is light which would be less likely to lead to a sound conclusion than to lead astray. The jury, assisted by the opinions of medical witnesses, would be better able to judge of the treatment from the treatment itself than from the more remote consideration of the defendant's professional reputation, which was consequently not the best evidence of which the case was susceptible.

The nature and properties of the powders employed by the defendant in the particular instance, were subjects of medical inquiry, and proper for the medical witnesses as experts. The questions put to them on that head ought to have been answered.

But the matter which was probably most prejudicial to the plaintiff in the estimation of the jury, was the evidence to prove the declarations of his prochein amy, before he had acted as such, that "the doctors would help him through," or that "the doctors would work it through." The plaintiff would have little chance if the testimony of his most material witnesses were put down to the account of professional jealousy. But according to the testimony, these declarations were made before the writ was purchased, and when the prochein amy had no other concern in the contest than every father has in the welfare of his child; and that they were not competent for that reason, is stated as an elementary principle in *Greenleaf's Evidence* (page 211), a book whose accuracy is surpassed only by its usefulness. As admissions or confessions, therefore, these declarations were incompetent.

Judgment reversed, and *venire de novo* awarded.